DELAWARE DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION FOR THE VISUALLY IMPAIRED

v.

UNITED STATES DEPARTMENT OF EDUCATION and the Secretary of the United States Department of Education.

Appeal of Robert ALBANESE, Appellant.

No. 84–5614.

United States Court of Appeals, Third Circuit.

Argued May 2, 1985.

Decided Sept. 9, 1985.

Rehearings and Rehearing En Banc Denied Nov. 20, 1985.

**1124**

Kenneth Kreshtool (argued), Jacob Kreshtool, Wilmington, Del., for appellant.

Susan H. Kirk-Ryan (argued), Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for Del. Dept. of Health and Social Services, Div. of the Visually Impaired.

Joseph J. Farnan, Jr., U.S. Atty., Wilmington, Del., Richard K. Willard, Acting Asst. Atty. Gen., William Kanter, Carlene V. McIntyre (argued), Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for U.S. Dept. of Educ. and Secretary of U.S. Dept. of Educ.

William C. Gleisner, III, David L. Nichols, Weiss, Steuer, Berzowski, Brady & Donahue, Milwaukee, Wis., for amicus curiae of the Nat. Federation of the Blind.

Before GIBBONS and HIGGIN-BOTHAM, Circuit Judges and SAROKIN, District Judge.*

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Robert Albanese, a blind vendor licensed to operate a vending site under the Ran-

* Hon. H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation.

dolph-Sheppard Act, 20 U.S.C. § 107 *et seq.* (1982), appeals from a summary judgment in favor of the Delaware Department of Health and Social Services, Division for the Visually Impaired (Delaware), vacating the award of an arbitration panel in his favor against Delaware. The appeal requires that we determine the scope of relief available against states participating in this unique, statutorily created program designed to assist blind persons to become self-sufficient. The arbitrators awarded Albanese retroactive monetary relief and attorneys' fees. The district court held that the Act did not authorize retroactive relief, and that the arbitration panel erred in awarding attorneys' fees. Thus it vacated the arbitrators' award. We reverse.

## I.

### The Statutory Scheme

The Randolph-Sheppard Act first became law in 1936. Pub.L. No. 74–732, ch. 638, 49 Stat. 1559 *et seq.* (1936) (codified as amended at 20 U.S.C. §§ 107–107f (1982)). As originally enacted, the Act provided in relevant part:

> **Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,** That for the purpose of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting blind persons licensed under the provisions of this Act shall be authorized to operate vending stands in any Federal building where, in the discretion of the head of the department or agency in charge of the maintenance of the building, such vending stands may be properly and satisfactorily operated by blind persons.

> SEC. 2. (a) The Office of Education in the Department of the Interior, subject to the direction of the Commissioner of Education and such rules and regulations as he may, with the approval of the Secretary of the Interior, prescribe, shall—

> .    .    .    .    .

> (4) Designate as provided in section 3 of this Act the State commission for the blind in each State, or, in any State in which there is no such commission some other public agency to issue licenses to blind persons who are citizens of the United States and at least twenty-one years of age for the operating of vending stands in Federal and other buildings in such State for the vending of newspapers, periodicals, confections, tobacco products, and such other articles as may be approved for each building by the custodian thereof and the State licensing agency;

> .    .    .    .    .

> (b) The State licensing agency shall, in issuing each such license for the operation of a vending stand, give preference to blind persons who are in need of employment and have resided for at least one year in the State in which such stand is to be located. Each such license shall be issued for an indefinite period but may be terminated by the State licensing agency if it is satisfied that the stand is not being operated in accordance with the rules and regulations prescribed by such licensing agency. Each such license for the operation of a vending stand in a Federal building shall be subject to the approval of the Federal agency having charge of the building in which the stand is located. Such licenses shall be issued only to applicants who are blind within the meaning of this Act but are able, in spite of such infirmity, to operate such stands.

> (c) The State licensing agency designated by the Office of Education is authorized, with the approval of the custodian having charge of the building in which the vending stand is to be located, to select a location for such stand and the type of stand to be provided.

> SEC. 3. (a) A State commission for the blind or other State agency desiring to be designated as the agency for licens-

ing blind persons for the operation of vending stands as provided in this Act shall, with the approval of the governor of the State, make application to the Commissioner of Education and agree—

(1) To cooperate with the Commissioner of Education and with the division of vocational rehabilitation of such State in training, placing, and supervising blind persons;

(2) To provide through loan, gift, or otherwise, for each blind person licensed to operate a stand, an adequate initial stock of suitable articles to be vended therefrom....

49 Stat. at 1560. By its terms the Act afforded to state agencies responsible for rehabilitation of blind persons the opportunity to gain access to sites in federal buildings if the agencies were willing to cooperate with the federal Commissioner of Education in a rehabilitation program for such persons. Manifestation of a state's willingness to enter the program, which applied to both federal and "other buildings in [the] [s]tate," *id* at 1559, required that the state agency "make application to the Commissioner of Education and agree" to federal requirements. *Id.* at 1560. Thus, as first enacted, the Randolph-Sheppard Act contemplated a contractual relationship between participating states and the federal government.

In the Vocational Rehabilitation Amendments of 1954, Pub.L. No. 83–565, ch. 655, 68 Stat. 663, section 3 of the Randolph-Sheppard Act was substantially amended,[1] to provide:

A State commission for the blind or other State agency desiring to be designated as the licensing agency shall, with the approval of the chief executive of the State, make application to the Secretary and agree—

"(1) to cooperate with the Secretary in carrying out the purpose of this Act;

"(2) to provide for each licensed blind person such vending stand equipment, and adequate initial stock of suitable articles to be vended therefrom, as may be necessary: **Provided, however,** That such equipment and stock may be owned by the licensing agency for use of the blind, or by the blind individual to whom the license is issued: **And provided further,** That if ownership of such equipment is vested in the blind licensee, (A) the State licensing agency shall retain a first option to repurchase such equipment and (B) in the event such individual dies or for any other reason ceases to be a licensee or transfers to another vending stand, ownership of such equipment shall become vested in the State licensing agency (for transfer to a successor licensee) subject to an obligation on the part of the State licensing agency to pay to such individual (or to his estate) the fair value of his interest therein as later determined in accordance with regulations of the State licensing agency and after opportunity for a fair hearing.

"(3) that if any funds are set aside, or caused to be set aside, from the proceeds of the operation of the vending stands such funds shall be set aside, or caused to be set aside, only to the extent necessary for and may be used only for the purposes of (A) maintenance and replacement of equipment; (B) the purchase of new equipment; (C) management services; and (D) assuring a fair minimum return to operators of vending stands: **Provided, however,** That in no event shall the amount of such funds to be set aside from the proceeds of any vending stand exceed a reasonable amount which shall be determined by the Secretary;

"(4) to make such reports in such form and containing such information

---

1. One purpose of the 1954 amendments was to require that blind vendors be given preference to operate vending sites in federal facilities even if employees preferred to install vending machines, the profits from which could be used for employee benefits. *See* S.Rep.No. 907, 93d Cong., 2d Sess. 5–7 (1974).

as the Secretary may from time to time require and to comply with such provisions as he may from time to time find necessary to assure the correctness and verification of such reports;

"(5) to issue such regulations, consistent with the provisions of this Act, as may be necessary for the operation of this program;

"(6) to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending stand program an opportunity for a fair hearing."

68 Stat. at 664. The 1954 amendment thus carried forward the contractual relationship feature of the original Act and added the foregoing requirement that the state agree that blind vendors have certain property interests in the businesses established pursuant to the Act. The blind vendors became, in effect, third party beneficiaries of the agreements between the participating states and the federal government. Moreover the states applying to participate in the program undertook in section 3(6) to provide for blind licensees dissatisfied with the operation of the program "an opportunity for a fair hearing." The 1954 amendment did not, however, specify the nature of the hearing or the relief which should be afforded as a result of such a hearing. Nevertheless, it is clear that by authorizing the federal government to contract with the states on the terms specified in section 3, Congress intended to confer legally enforceable rights on the blind beneficiaries of the program. The term "fair hearing" cannot otherwise be understood than as an expression of the intention to require participating states to provide a mechanism of dispute resolution to effectively enforce those rights. States participating in the program after 1954 are so bound. In consideration of the states' undertakings, the federal government grants to state agencies the right to license federal sites to blind vendors.

2. *See also* Pub.L. No. 93–516, 88 Stat. 1617 (1974). Pursuant to an order of the court in *Kennedy v. Jones,* 412 F.Supp. 353 (D.D.C.1976), H.R. 14225 was deemed to have become law

Senator Jennings Randolph, the longtime chairman of the Subcommittee on Handicapped Workers of the Senate Committee on Labor and Public Welfare, dissatisfied with the workings of the program, in 1969 proposed legislation which would require binding arbitration between grieving blind vendors and state agencies and between state agencies and the federal government. S. 2461, 91st Cong.2d Sess. (1969). Hearings were held on S. 2461 in both the Senate and the House of Representatives, but the 91st Congress adjourned without considering it further. Senator Randolph introduced a similar bill, S. 2506, in the 92d Congress in September of 1971. A renamed Subcommittee on the Handicapped reported S. 2506 to the full committee, but agreed to a resolution directing a study of the program by the Comptroller General of the United States. That study, entitled Review of Vending Operations on Federally Controlled Property, No. B–176886, was presented to Congress in September 1973. Senator Randolph introduced S. 2581 which reflected some of the findings contained in the Comptroller General's report. S. 2581, 93d Cong. 1st Sess. (1973). Following hearings, S. 2581 was reported favorably by the Subcommittee on the Handicapped. A House Bill, H.R. 14225, substantially similar to S. 2581, was passed over a presidential veto and became law on November 21, 1974. Pub.L. No. 93–651, 89 Stat. 2–3 (1974).[2] All versions proposed by Senator Randolph between 1969 and 1974 contained a provision for arbitration. The version enacted amended section 3(6) to read:

to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and *to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration as provided in section 5 of this Act [20 U.S.C. § 107d–1].*

without approval by the President on November 21, 1974. The separate public law designations refer to the same legislation.

Pub.L. No. 93–651, 89 Stat. 2–3 at 2–10, *codified* at 20 U.S.C. § 107b(6) (1972). (emphasis supplied). The language of the 1936 and 1954 versions of section 3 providing that states desiring to participate must "make application to the Secretary and agree—" was not changed. Instead, Congress added to section (3)(6) the requirement that participating states "agree to submit the grievance of any blind licensee not otherwise resolved [in a fair hearing] to arbitration" as provided in a new section of the Act.

> Section 5(a) of the 1974 Act provides: Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 3(6) of this Act. [20 U.S.C. § 107(b)(6)].

20 U.S.C. § 107d–1(a) (1982). This provision thus defines the "fair hearing" which the state must agree to provide as "a full evidentiary hearing." Section 5(a) continues:

> If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary [of Health, Education, and Welfare] who shall convene a panel to arbitrate the dispute pursuant to section 6 of this Act [20 U.S.C. § 107d–2], and the decision of such panel shall be final and binding on the parties except as otherwise provided in this Act.

20 U.S.C. § 107d–1(a) (1982). Thus the arbitration to which a participating state agrees by virtue of the 1974 amendment to section 3 occurs, if requested, following an evidentiary hearing at the state agency level. The arbitration is conducted before a panel convened by the Secretary of Health, Education and Welfare. Section 6(b) of the 1974 Act specifies the makeup of the arbitration panel. 20 U.S.C. § 107d–2(b).

Section 6(a) of the 1974 Act provides in relevant part:

> Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.

20 U.S.C. § 107d–2(a) (1982). The cross-references to Chapters 5 and 7 of Title 5 are to the administrative procedure and judicial review provisions of the Administrative Procedure Act. In this respect section 6(a) is unique, in that it provides for a scope of judicial review considerably broader than that available under the Federal Arbitration Act. 9 U.S.C. §§ 9, 10. Under that Act, arbitrators' decisions on the merits are generally regarded as substantially unreviewable so long as the decisions draw their essence from the contractual undertaking to arbitrate. *Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir.1969). By contrast, 5 U.S.C. § 706 (1982) permits the reviewing court to set aside agency adjudicative actions which are: arbitrary, capricious, an abuse of discretion or otherwise not in accordance to law, without observance of procedures required by law, or unsupported by substantial evidence.

A careful review of the evolution of this unique statutory review scheme suggests the reasons why it was chosen by Congress. Originally, in S. 2461 in 1969 and S. 2506 in 1971, Senator Randolph proposed merely to amend Section 3(6) dealing with arbitration between operators and the state so it would read:

> (6) to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending stand program an opportunity for a fair hearing, *including binding arbitration by three persons consisting of one person designated by the head of the State licensing agency, one person designated by the licensed blind operator, and a third person selected by the two who, shall serve as chairman.*

Arbitration between the states and the federal government was provided for in a sep-

arate section of S. 2461 and S. 2506. These provisions were included primarily to deal with the disputes which had often arisen in the administration of the Randolph-Sheppard Program when certain federal departments were unwilling to provide sites for blind vendors. Following the Comptroller General's report, Senator Randolph introduced S. 2581 which contained, in substance, the arbitration provisions now found in 20 U.S.C. § 107d–1(a) and (b).[3] Section 107d–1(b) deals with arbitration of disputes between state licensing agencies and federal agencies over placement or operation of vending facilities in federal facilities, and is not in issue here. Section 107d–1(a) deals with arbitration of disputes between state licensing agencies and blind vendors. Both subsections are subject to the judicial review provision in 20 U.S.C. § 107d–2(a). We have been unable to find any specific explanation for the addition of this judicial review provision which is unique in an arbitration context. However, testimony presented in the course of the Subcommittee Hearings in 1971 indicates that the committee members were made aware that requiring arbitration of disputes to which a state or the federal government is a party would involve a delicate state-federal relationship. *See, e.g.,* Randolph-Sheppard Act for the Blind Amendments of 1971: Hearings on S. 2506 Before the Subcomm. on Handicapped Workers of the Senate Comm. on Labor and Public Welfare at 65–71, 92d Cong., 1st Sess. (1971) (Testimony of E.B. Whitten,

National Rehabilitation Association). We are convinced that it is this awareness which motivated the drafters to provide for broader judicial review of arbitral decisions than is available under the Federal Arbitration Act.

By the fall of 1973, when the Subcommittee on the Handicapped held hearings on S. 2581, the arbitration clauses were, for practical purposes, in their present form.[4] In those hearings Charles Hoehne, Executive Director, National Council of State Agencies for the Blind, testified about those provisions. This spokesperson for state agencies stated:

We do have some questions about the procedures which are specified for the resolution of disputes. Certainly no member agency of the national council would in any manner oppose the principle of providing every individual an opportunity for having a grievance fairly and promptly and expeditiously resolved with a minimum of expense to him and the agency, but we wonder about arbitration procedures which if we read them correctly that appear to require the Secretary of Health, Education, and Welfare to get involved in a dispute between licensing agency and operator. The principle of arbitration is one we strongly support.

The mechanics and procedures for implementing that principle, however, are of some concern, and it has been suggested that perhaps an arbitration route

---

**3.** The original version of S. 2581 was introduced on October 13, 1979. Following hearings on the bill, the only change made in the original version's treatment of arbitration of blind vendors' grievances was to incorporate, by reference, the already existing section 3(6) "fair hearing" requirement into section 5(a). This action was apparently taken to make it clear that resort to a state hearing is a precondition to the convening of an arbitration panel under section 5(a). The following is section 5(a) of S. 2581 as it was reported to the Senate on June 17, 1974, and which ultimately was enacted in that form. The italicized portion represents the aforementioned amendments to Senator Randolph's original version of S. 2581.

"Any blind licensee who is dissatisfied with any action arising from the operation or ad-

ministration of the vending facility program *may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 3(6) of this Act. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing,* he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 6 of this Act, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this Act."

The minor changes made to the original version of section 5(b) are not relevant to this appeal.

**4.** *See supra* note 2 at 1127.

composed solely of State level [sic] for disputes that arise solely at the State level might be more effective, less costly and a little less cumbersome.

Randolph-Sheppard Act for the Blind Amendments of 1973: Hearings on S. 2581 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare at 47–48, 93d Cong., 1st Sess. (1973) (Testimony of Charles Hoehne, Executive Director, National Council of State Agencies for the Blind). In his prepared statement Mr. Hoehne noted:

> We do not say that we should, with respect to grievances of blind licensees, be trying our own cases, while at the same time protesting with the greatest vigor existing provisions which in effect allow federal agencies, with respect to disputes between state agencies and such federal agencies, to try their own cases.

*Id.* at 84. Thus the spokesperson for the state agencies participating in the Randolph-Sheppard program strongly supported the concept of arbitration of disputes, quarreling only with the composition of the arbitration panels when the dispute was between a blind vendor and a state agency.

Mr. Hoehne also commented on the judicial review provision:

> The National Council of State Agencies for the Blind is, Mr. Chairman, firmly committed to the idea that the right to judicial review should expressly be preserved to any aggrieved party of interest—whether that party be the blind li-

censee, the state licensing agency or a federal agency. Purely as a technical matter, then, a question is raised about the appropriateness of using the terminology "binding arbitration".

*Id.* at 85–86. Mr. Hoehne's technical point was that judicial review to the extent provided in the Administrative Procedure Act made arbitration somewhat less binding than usual. Probably as a result of his comment the word "binding" which appears in S. 2581 was omitted from the bill as enacted. The endorsement of the judicial review provision by the National Council of State Agencies for the Blind reinforces our conclusion that the scope of judicial review of arbitral awards was broadened because of the perceived delicacy in subjecting governmental agencies, both state and federal, to enforcement of such awards.

Except for the unique judicial review provision, there is no indication in the text of the legislation or in any legislative history suggesting that Congress used the term arbitration in any manner different from its conventional usage in other contexts such as the Federal Arbitration Act. No witness in hearings on S. 2581, and no member of Congress ever suggested that the scope of relief which could be awarded in these arbitration proceedings, agreed to by virtue of a state's voluntary participation in the Randolph-Sheppard program, was in any degree different than that available in other arbitration proceedings.[5]

---

5. The Report from the Senate Committee on Labor and Public Welfare on the Randolph-Sheppard Act Amendments discusses the arbitration and judicial review provisions:

ARBITRATION AND JUDICIAL REVIEW

The bill creates two new sections of the Act which establish the machinery for a grievance resolution procedure for blind licensees and State agencies. New section 5 of the Act permits a blind licensee who is dissatisfied with the operation or administration of the program to request a full evidentiary hearing by the State licensing agency. If the dispute is not satisfactorily resolved, the licensee may file a complaint with the Secretary, who shall convene an arbitration panel. A State licensing agency may also ask for arbitration if it determines that a Federal agency in control of

Federal property is failing to comply with the Act or regulations. Section 6 of the Act sets forth the arbitration panel selection process, specifies that the panel give notice, conduct a hearing, and render a decision, which shall be a final agency action for purposes of judicial appeal under the Administrative Procedure Act. The panel's decision is to be published in the Federal Register, and the Secretary is to pay all reasonable costs of the arbitration proceedings.

The Committee considers the arbitration procedures contained in S. 2581 to be valuable tools for the resolution of disputes. Under current circumstances the machinery for prompt and satisfactory disposition of blind licensee and State agency complaints does not exist except where individual States have pro-

Moreover the 1974 legislation made no changes in the basic federal-state relationship, constant since 1936, that in consideration of access to sites in federal premises the states "make application to the Secretary and agree—" 20 U.S.C. § 107b.

For purposes of this case, Delaware, like all states participating in the Randolph-Sheppard program, made application and "agree[d] to submit the grievances of any blind licensee not otherwise resolved by [a fair hearing] to arbitration as provided in section 107d–1 of this title." 20 U.S.C. § 107b(6). In 1979, acting pursuant to 20 U.S.C. § 107b(5) and the Department of Education's Regulation, 34 C.F.R. 395.4 (1984), the Delaware Division of the Visually Impaired and the Delaware Committee of Blind Vendors developed rules and regulations governing the operation of the Randolph-Sheppard blind vendor program in Delaware. The rules, which set forth Delaware's responsibilities under the Act, were signed by Norman Balot, Director of the Delaware Committee of Blind Vendors [6] and by Pierre S. duPont IV, Governor of Delaware. As required by 20 U.S.C. § 107b(6), and by implementing regulations [7] the Delaware rules provide for a full evidentiary hearing upon a blind vendor's complaint "arising from the operation or administration of the vending facility program." App. 17. The Delaware regulations specify further:

> vided, on their own, some grievance procedure. The Comptroller General's report states that HEW and State agencies are still without recourse from decisions of Federal agencies regarding blind vendor facilities on property they control. Moreover, blind vendors have attempted to bring their grievances to the judicial system for resolution. In the case *Wilson v. Blount*, for example, the U.S. District Court for the District of Kansas [309 F.Supp. 263 (1968)] held that the plaintiff blind vendor had no standing to challenge the legal basis of the decision of the Postmaster General to remove vending machines from a postal facility. The court was upheld on appeal [422 F.2d 866 (1970)], and the U.S. Supreme Court denied certiorari [400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970)]. It is the expectation of the Committee that the arbitration and review procedures adopted in S. 2581 will provide the means by which aggrieved vendors and State agencies may obtain a final and satisfactory resolution of disputes. It is

Should the vendor still be dissatisfied, the vendor may request the Secretary ... to convene an ad hoc arbitration panel, in accordance with Section 1369.13 [34 C.F.R. § 395.13] of the federal regulations issued under the Randolph-Sheppard Act, as amended. The decision of that panel will be binding on all parties.

App. 18. Thus, in its own regulations Delaware has acknowledged its contractual obligation to the United States to submit disputes with blind vendors to binding arbitration.

## II.

### The Albanese Dispute

Albanese is, as noted above, a blind vendor licensed by the Delaware Division of the Visually Impaired for participation in the Randolph-Sheppard program. Delaware has exercised the option, permitted by the federal regulations, of initially stocking each location, and retaining ownership of the equipment at each location. *See* 34 C.F.R. § 395.4(c) (1984). A federal regulation requires that state licensing agencies establish in writing and maintain policies which govern transfer, promotion, and financial participation of vendors. 34 C.F.R. § 395.7(c) (1984). In compliance with that regulation, Delaware's rules set forth a comprehensive scheme for the dis-

> not anticipated that these mechanisms will be used with great frequency, and it is expected that the Secretary will refuse to convene an arbitration panel if, in his reasoned and documented opinion, a complaint is specious or has been brought solely for the purpose of harassment.
> S.Rep. No. 937 to accompany S. 2581, 93d Cong., 2d Sess. 20 (1974).

**6.** Participation by a State Committee of Blind Vendors in the development and administration of the Randolph-Sheppard program is required by 20 U.S.C. § 107b–1(3) (1982) and 34 C.F.R. § 395.14 (1984).

**7.** 34 C.F.R. § 395.3(11)(vii) (1984) requires an assurance that the state will "[s]ubmit to an arbitration panel those grievances of any vendor unresolved after a full evidentiary hearing...."

tribution of funds generated at each blind vendor facility. App. 12. Of particular significance to this case, is the state regulation which deals with transfer and promotion of blind vendors. The regulation provides:

When a management position is to be filled, the Delaware Division for the Visually Impaired will solicit applications from all vendors. *The position will be filled by the most senior qualified applicant.* This will be done with the approval of the Delaware Committee of Blind Vendors.

App. 15. (emphasis supplied).

In August of 1979 the Delaware Division of Visually Impaired solicited applications for management of its food vending facility at the Paramount Poultry Company, in Georgetown, Delaware. Two applicants responded. Albanese claimed to be the most senior qualified applicant, but the Division of Visually Impaired in October, 1979 appointed a less senior applicant. Albanese, pursuant to the Delaware regulations, mandated by 20 U.S.C. § 107b(6) and 34 C.F.R. § 395.13(a) (1984), filed a grievance, which resulted in a full evidentiary hearing before a state hearing examiner on February 24, 1981.

The hearing examiner found that Albanese was the most senior qualified applicant, and ordered the Delaware Division of Visually Impaired to install him as manager of the Georgetown facility. Albanese commenced work there on April 1, 1981. The hearing examiner also ordered the state agency to pay a portion of Albanese's legal expenses but disallowed $1,254 of such expenses. The hearing examiner declined, however, to award Albanese the increased income he would have earned between the time he should have been appointed and April 1, 1981, when he commenced work.

Pursuant to 20 U.S.C. § 107d–1(a) Albanese filed a complaint with the Secretary of Education alleging his dissatisfaction with the failure of the state hearing examiner to award back pay and full legal expenses. The only relief sought in the complaint is:

1. A sum of money equal to Complainant's loss of earnings caused by the licensing agency's wrongful conduct, plus interest; and

2. Legal expenses necessarily incurred by Complainant in the sum of $1,254, which sum was arbitrarily disallowed by the Hearing Examiner.

3. Allowable costs of this arbitration.

App. 22–25.

In response to Albanese's complaint to the Secretary, the Delaware Division for the Visually Impaired on October 26, 1981 filed a somewhat astonishing "answer," in which after admitting to being the licensing agency designated to administer the Randolph-Sheppard Act blind vendor program, it challenged the merits of the hearing examiner's ruling. Although neither 20 U.S.C. § 107d–1(a) nor the implementing federal regulations make any provisions for review by the Secretary or for arbitration of a State agency's claim that a state fair hearing examiner granted too much relief to a blind vendor, the Division for the Visually Impaired requested that "[t]he hearing examiner's decision on the merits of this case placing Albanese in the management position at Paramount Poultry ... be overturned as violative of the rules and regulations of the Division for the Visually Impaired...." It is not clear whether this request was for relief from the Secretary, or from the arbitrator the Secretary would appoint pursuant to 20 U.S.C. § 107d–2(b). It is clear that with regard to disputes between blind vendors and state licensing agencies the statute confers on the Secretary only the authority to convene an ad hoc arbitration panel. Moreover arbitration of such disputes is available only to a blind licensee dissatisfied with the decision of a state hearing examiner. 20 U.S.C. § 107d–1(a). The Division for the Visually Impaired, in the form of an "affirmative defense," also objected to the only relief sought by Albanese, alleging:

2. The hearing examiner below improperly awarded attorney's fees to complainant. There is no statutory or reg-

ulatory authorization for such an award. Furthermore, the Delaware Supreme Court has conclusively ruled that attorney's fees cannot be awarded against the State absent such authorization. See *Wilmington Medical Center Inc. v. Severns,* [433 A.2d 1047 (1981)], attached hereto.

3. The State of Delaware cannot be sued without its consent. Delaware Constitution Article 1, Section 9, *Shellhorn and Hill, Inc. v. State,* Del.Supr. 187 A.2d 71 (1962); *Edelman v. Jordan,* 415 U.S. [651] 663, [94 S.Ct. 1347, 1355, 39 L.Ed.2d 662] (1974). Therefore, damages in the form of back pay cannot be awarded against the State or the Division for the Visually Impaired. Complainant's request for back pay must be denied.

App. 27. Thus the State of Delaware, acting through its highest official, the Governor, having solemnly entered into an agreement with the United States, that in consideration for access to vending sites on federal property it would grant to all blind vendors fair hearings, and that it would submit to arbitration the claims by blind vendors dissatisfied with the outcome of such hearings, now asserted that the agreement was meaningless. At the same time, however, Delaware sought from some federal authority—either the Secretary or an arbitration panel—relief even from the limited award made by its own hearing examiner.[8]

Unfruitful settlement negotiations followed. On May 13, 1982 the United States Department of Education ruled:

It is the opinion that the complaint meets the requirements of Section 3 of the arbitration procedures governing the arbitration of disputes between a licensed blind vendor and a State licensing agency (copy enclosed), and therefore, in accordance with Section 5(a) of the procedures, we are authorizing the convening of a panel to resolve the single issue of hearing examiner's failure to award compensatory damages.

Letter from George A. Conn, Commissioner, Rehabilitation Services Administration, Office of the Assistant Secretary for Special Education and Rehabilitation Services, United States Department of Labor, to Jacob Kreshtool, Attorney for Robert Albanese (May 13, 1982). Thus the agency charged with the responsibility for determining whether to convene an arbitration panel made two rulings: (1) that Delaware's claim that Albanese should not have been placed in the Georgetown job is not arbitrable; and (2) that Albanese's claim for retrospective relief in the form of a monetary award is arbitrable. Such compensatory relief is the only relief Albanese sought, and the only claim submitted to arbitration. Thus the Agency charged with administration of the Randolph-Sheppard Act in effect rejected Delaware's contention that sovereign immunity barred an arbitration award of retrospective damages.

An arbitration panel was duly convened, and before that panel Delaware once again contended that despite its agreement with the United States, it could assert sovereign immunity against Albanese's claims. The arbitrators unanimously rejected that contention, reasoning:

We will first address the question of whether the Grievant is barred from any back pay award as the result of the doctrine of sovereign immunity. We are impressed with the arguments made by the State regarding the requirement that there be specific statutory waiver by the State of the doctrine of sovereign immunity before damages may be assessed against it. However, we are not convinced that the doctrine of sovereign immunity applies in the instant case. We are better persuaded by the arguments of the Grievant that the program estab-

---

**8.** Delaware's position is reminiscent of that taken by Georgia in 1793, when in *Georgia v. Brailsford,* 2 U.S. (2 Dall.) 415, 1 L.Ed. 438 (1793), it contended that the Supreme Court should grant it affirmative relief, while simultaneously urging in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), that the Court could not entertain a suit against it. The difference, of course, is that Georgia, unlike Delaware, had not contracted with the United States.

lished by the Secretary of Education, which provides certain funding for state licensing agencies, contemplates that pursuant to federal statute there shall be a grievance and arbitration procedure established for individuals who feel that they have been wronged by a licensing agency in the implementation and application of this program. We are further persuaded by the Grievant's arguments that the State, by full participation in the program and the acceptance of federal funding, has adopted the responsibilities which are inherent in a grievance and arbitration system that contemplates remedies for wrongs. We are also impressed with the Grievant's argument that the doctrine of sovereign immunity, specifically references the established judicial system, and that arbitration proceedings are of a private contract nature and require the application of well-understood and long-established practices used in the resolution of disputes which arise in such forums.

App. 51–52. The arbitrators therefore awarded Albanese monetary damages in the form of back pay for the period of October 1, 1979 through March 31, 1981.

The arbitrators also addressed the claim for counsel fees. With respect to the state hearing officer's grant of a fee award the arbitrators made the following observations:

> Turning to the question of attorney's fees, the Arbitration Panel must first observe that the same general principles regarding the fashioning of a remedy by arbitrators are appropriately applied here as they were when we discussed the question of back pay for improper denial of a promotion or transfer.... In the instant case, the Grievant had no independent representative resources that he could use to prosecute his own "case of dissatisfaction." The record indicates that he made several good faith attempts to have his matter of dissatisfaction heard and was, unfortunately, rebuffed at each turn. Thus, the Grievant was reasonable and prudent when he chose to retain counsel for the initiation and presentation of his claim....

> We are further led to conclude that the awarding of attorney's fees is reasonable in the circumstances and appropriate, in view of the fact that Hearing Officer Van Sant recognized the recoverability of attorney's fees, when he awarded certain specified amounts to Grievant's counsel. We note that the State did not specifically object to the Van Sant award, nor has it shown that the payment of attorney's fees in these unusual circumstances was arbitrary or capricious or an illegal action by Hearing Officer Van Sant.

App. 56–57. We do not read the last quoted sentence as an exercise by the arbitrators of any assumed authority to review the attorney's fee award already in place as a result of the state hearing examiner's ruling. To that extent the award was not within the scope of the arbitration, because Albanese was not "dissatisfied" with it. 20 U.S.C. § 107d–1(a). Rather, the arbitrators merely cited the hearing examiner's award as authority for an award for fees incurred in the pre-arbitration proceedings. That is made clear by the arbitrators' award:

> We have reviewed the submission made on behalf of Grievant's counsel, and to the best of our knowledge find that the time claimed and the billing rate is reasonable and ordinary in the nature of the fee structure of the marketplace.

> Accordingly, we will award claimed attorney's fees to and through the filing of the post-hearing brief.

App. 57. Thus the arbitrators awarded the $1,254 in fees which the state hearing examiner disallowed.

The arbitration decision was received by the United States Department of Education on December 28, 1982. On January 6, 1983 that Department forwarded a copy to the Delaware Division for the Visually Impaired, and to Albanese advising them that they could seek judicial review pursuant to 20 U.S.C. § 107d–2(a).

### III.

### District Court Proceedings

The Delaware Division for the Visually Impaired filed a complaint against the Unit-

ed States Department of Education, alleging three claims. App. 3. The plaintiff construed the Department's January 6, 1983 letter to be an adoption of the decision of the arbitration panel as the final agency action of the Department. Complaint, ¶ 14, App. 7. The complaint alleges that

> [t]he decision ... awarding Mr. Albanese back pay and attorney's fees is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in that it ignores Article I, Section 9 of Delaware's Constitution, which grants sovereign immunity to Delaware and its agencies, and it violates the principles embodied in the Eleventh Amendment of the United States Constitution.

Complaint, ¶ 15, App. 7. The second claim avers that the award "is contrary to the constitutional rights, powers, privileges or immunities to which D.V.I. is entitled under Article I, Section 9 of Delaware's Constitution and the Eleventh Amendment to the United States Constitution." Complaint, ¶ 16, App. 7. It is unclear in what manner this second claim differs from the first, since state sovereign immunity and the eleventh amendment are the sole basis for the claim that the award is arbitrary, capricious, an abuse of discretion or not in accordance with law. Finally, a third claim maintains that the fee award is unlawful because of the provision in the Randolph-Sheppard Act which states that "[t]he Secretary shall pay all reasonable costs of arbitration under this section in accordance with a schedule of fees and expenses he shall publish in the Federal Register." 20 U.S.C. § 107d–2(d). Complaint ¶ 17, App. 7–8.

The United States Department of Education filed an answer which is in some respects internally inconsistent. First, the Department denied that it had adopted in its January 6, 1983 letter the decision of the arbitrators.

> Rather, Federal defendants transmitted the decision to the blind vendor, Robert Albanese, and to the plaintiff on that date, advising them that pursuant to 20 U.S.C. § 107d–2, the subject decision constituted "final agency action" for the purposes of judicial review.

Answer ¶ 14, App. 77. The Department also pleaded that 20 U.S.C. § 107d–2(d) does not authorize the Secretary of Education to pay attorney's fees of blind vendors as part of "the reasonable costs of arbitration." Answer ¶ 17, App. 77. Thus the United States took the position that the dispute was one between Albanese and the Division for the Visually Impaired, except to the extent that the latter might attempt to shift the fee award to it. Instead of resting on the claim that it was the action of the arbitrators, not that of the Department, that was under review, and thus that the United States was not a proper party, the Department gratuitously, and for reasons which are unfathomable, decided to align itself with Delaware in opposing the award to Albanese. It pleaded:

> 15. In answer to paragraph 15. Federal defendants admit that the panel award of back pay and attorney fees against plaintiff is contrary to the principle of sovereign immunity embodied in the Eleventh Amendment to the United States Constitution, and further aver that the disputed award is not authorized by the Randolph-Sheppard Act.

Answer ¶ 15, App. 77. In its prayer for relief the United States asked the court to "[r]everse the disputed arbitration panel decision for the reasons set forth above." Answer, App. 78. This pleading is quite mysterious in that it is entirely inconsistent with the position that the Department took when it convened the arbitration panel for the sole purpose of considering Albanese's claim for retrospective monetary relief.

Thus, following the filing of the federal defendants' answer, it is doubtful that there was a genuine case or controversy over the validity of the arbitration award, since the state plaintiffs and the federal defendants were in complete agreement that Albanese, not yet a party, should lose. *See Moore v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590 (1971); *United States v. Johnson*, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed.

1413 (1943). The case or controversy deficiency was cured, however, when in November of 1983 the district court entered an order permitting Albanese to intervene and file an answer. Following Albanese's intervention, the Division for the Visually Impaired and Albanese made cross-motions for summary judgment. The Secretary of Education, by contending that the arbitration panel decision was not his and was not binding on him, was permitted to argue in support of Delaware's motion. The district court granted Delaware's motion. *Delaware Department of Health and Social Services, Division for the Visually Impaired v. United States Department of Education*, 592 F.Supp. 1038 (D.Del.1984). The court concluded that prospective arbitral relief against Delaware was clearly within the authority of the arbitrators (an issue which was never presented), but that given the eleventh amendment, Congress could not have intended that the arbitrators have the authority to award retrospective relief. *Id.* at 1041–42. Relying on *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the court concluded that the arbitrators erred in awarding counsel fees. *Delaware Department of Health and Social Services*, 592 F.Supp. at 1043. Therefore, the court vacated the entire award. We address the two issues separately.

### A. Compensatory Relief

When Congress in 1974 provided that states desiring to gain access to blind vendor locations in federal facilities must agree to submit to arbitration their disputes with blind vendors, the term arbitration had a well-recognized meaning. Congress was surely aware that arbitrators proceeding under the authority of the Federal Arbitration Act or under the authority of the Uniform Arbitration Act, as a matter of course awarded retrospective compensatory relief in appropriate cases. *See generally*, G. Wilner, Domke on Commercial Arbitration, § 30.02 (rev. ed. 1984). Furthermore, awards of back pay in arbitrations under collective bargaining agreements were, by then, commonplace. *See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The Randolph-Sheppard Act has specified, since 1936, the terms upon which participating states may contract with blind vendors. The contractual relationship is both analogous to and different from the relationship resulting from a collective bargaining agreement or a single person employment contract. It is analogous because the participating state, like a typical employer, maintains a large degree of control over the activities of the vendor. It is different because the vendor is compensated only out of the revenues which are generated at the site to which he is assigned. Nevertheless the relationship between the blind vendor and the state, like conventional employment relationships, is essentially contractual. The terms of the contract are standardized by virtue of the agreement between the participating states and the United States. Thus, since 1974 each blind vendor enjoys the benefit of the arbitration undertaking specified in 20 U.S.C. § 107b(6).

Since contract arbitration was in 1974 a legal concept with a well-settled content, there is no ambiguity in Senator Randolph's choice of the term. Moreover there is not one iota of legislative history suggesting that, insofar as it dealt with the relief which arbitrators could award, the term was understood by any member of Congress to have any meaning other than the conventional one.

■ The provision in 20 U.S.C. § 107d–2(a) for a scope of judicial review broader than that ordinarily available under the Federal Arbitration Act or the Uniform Arbitration Act does not suggest otherwise. The judicial review provision is applicable to *any* form of relief ordered by the arbitrators. Thus that provision lends no support for the distinction drawn by the district court between prospective and com-

pensatory relief.[9] Since the statutory language is unambiguous, and no legislative history supports any reading of the term arbitration other than the conventional one, the district court erred in concluding that the arbitrators in a Randolph-Sheppard arbitration were not authorized to award compensatory damages.

Delaware can prevail, therefore, only if there is legal authority for it to welsh on its contractual undertaking to arbitrate Albanese's claim for compensatory damages. It relies for such authority on provisions of the Delaware Constitution and on the eleventh amendment. Neither lend support to the state.

■ The Delaware Constitution, and Delaware law generally, is in our view irrelevant. Delaware has entered into a contractual relationship with the United States, and is thus bound under the terms of the Randolph-Sheppard Act to arbitrate Albanese's claim. Federal law governs the extent of liability of parties to a contract with the United States. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). There is no indication in the Randolph-Sheppard Act, which authorizes the United States to contract with the states, that the program was intended to be subject to the vagaries of state law. *See, e.g., Reconstruction Finance Corp. v. Beaver County*, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946) (federal consent to local real estate taxes incorporates local definition of fixtures); *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966) (Small Business Administration disaster loans subject to local married women laws respecting capacity to contract). Indeed it is inconceivable that Congress in 1936 or in 1974 could have

intended to condition its grant of states' access to vending sites on federal properties on terms which could be rendered meaningless by state laws permitting default on those very terms. But in any event, Delaware law does not authorize the state to renege on an arbitration agreement. That law provides:

It shall be lawful to include in any contract hereinafter executed by or on behalf of the State, or any department or agency thereof ... a provision that any matter in dispute arising under the said contract shall be submitted to arbitration in accordance with this chapter....

Del.Code Ann. tit. 10, § 5723 (1975). The reference to "this chapter" is to Delaware's version of the Uniform Arbitration Act. *Id.* § 5701 *et seq.* That Act provides that "[i]f the arbitration agreement provides a method of appointment of arbitrators, this method shall be followed." *Id.* § 5704. Delaware has agreed to the method of appointment provided in 20 U.S.C. § 107d–2(b). Thus Delaware law unequivocally authorized the state to contract with the United States on terms that would require it to arbitrate the claims of blind vendors, and to contract for arbitration with Albanese.[10]

■ Thus Delaware's only remaining argument in support of vacating the arbitrators' award is that the eleventh amendment somehow authorizes it to withdraw unilaterally from an arbitration agreement which it made with the United States, acting in the interest of blind vendors. That contention lacks merit. Our rejection of the eleventh amendment's application in this case does not require that we review the nuances, complexities, historical inaccuracies, and errors which have bedeviled that amendment since its ratification.[11] Delaware, by

---

**9.** Delaware, of course, contends that even prospective relief was improper. The Secretary properly limited the arbitration to Albanese's claims, and only those were properly before the district court.

**10.** Delaware is in no position to complain that review of the award is in the United States District Court rather than in a Delaware state court, for it resorted to the federal forum, seeking an order to vacate the award.

**11.** For the nuances, complexities, historical inaccuracies, and errors, see C. Jacobs, *The Eleventh Amendment and Sovereign Immunity* (1972); Engdahl, *Immunity and Accountability for Positive Governmental Wrongs*, 44 Colo.L. Rev. 1 (1972); Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines*, 126 U.Pa.L.Rev. 515 (Part I), 126 U.Pa.L.Rev. 1203 (Part II) (1977); Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow*

applying to participate in the Randolph-Sheppard program, has agreed to the remedies which that program requires. Assuming without deciding that the amendment has any possible application to proceedings before arbitrators—a proposition hardly supportable by the text [12]—such application plainly has been waived by Delaware when, after full notice of the Act's requirements, one of which was an agreement to arbitration, it voluntarily made application with the Secretary to participate in the Randolph-Sheppard program. *Parden v. Terminal Ry.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *Petty v. Tennessee-Missouri Bridge Comm'n.*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). The waiver of sovereign immunity with respect to arbitration could hardly have been made more clearly.

Thus, the district court's vacation of the award of back pay cannot be affirmed on the theory that the eleventh amendment authorized Delaware to renege on the arbitration agreement.

### B. Attorneys' Fees

The attorneys' fee dispute presents a narrow issue. We are not dealing with attorneys' fees incurred during the course of an arbitration proceeding.[13] Nor are we dealing with those attorneys' fees incurred in seeking relief at the state level which were already awarded by the state hearing examiner. As noted above, these were nev-er in issue before the arbitrators. We are dealing solely with the hearing examiner's disallowance of a portion of such expenses, $1,254. Narrowing the question further, we are not dealing with the reasonableness of the requested $1,254, for Delaware did not dispute the reasonableness of the amount in either the district court or this court. The sole question therefore, is whether the arbitrators, who concluded that the $1,254 request was reasonable, acted arbitrarily or capriciously, abused their discretion, or committed legal error in holding, that the additional fees should have been awarded. 20 U.S.C. § 107d–2(a); 5 U.S.C. § 706(2)(A).

As noted in Part II above, the arbitrators reviewed the time and billing rate and found both to be reasonable. Thus if an award of attorneys' fees was legally permissible, on any basis, for the services performed through the state level fair hearing, we could not find arbitrary or capricious action or an abuse of discretion. Indeed, the district court ruled against Albanese not on the basis that the arbitrators abused a discretion which they possessed respecting the amount of fees, but solely on the basis that *any* award was prohibited by the American Rule, as delineated in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386

*Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction*, 35 Stan.L.Rev. 1033 (1983); Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum.L.Rev. 1889 (1983); Orth, *The Interpretation of the Eleventh Amendment, 1798–1908: A Case Study of Judicial Power*, 1983 U.Ill.L.Rev. 423 (1983); Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case*, 98 Harv.L.Rev. 61 (1984).

**12.** The eleventh amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

**13.** The Secretary has construed 20 U.S.C. § 107d–2(d), which authorizes payment by the United States of "all reasonable costs of arbitration under this section," to require payment of a blind vendor's attorney's fees for the arbitration proceeding "[i]f the blind licensee is unable to obtain the services of counsel without cost either through a local or State legal services program, or through an interested association or organization...." Revised Interim Policies and Procedures for Convening and Conducting an Arbitration Pursuant to Section 5(a) and 6 of the Randolph-Sheppard Act, as Amended, ¶ 16(e) App. 74. The district court erroneously assumed that the arbitration award included fees "up to and including the date of the panel's decision." *Delaware Dep't of Health and Social Services*, 592 F.Supp. at 1040. The award is for fees "to and through the filing of the post-hearing brief." App. 57. We understand this to be a reference to the state level fair hearing.

U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

While the American Rule generally prevents a successful federal litigant from recovering attorneys' fees in the absence of statutory authority or an explicit contractual term providing for an award to the prevailing party, the rule does not, however, address the question of whether an award of attorneys' fees is an appropriate element of compensatory damages for breach of contract. *See Summit Valley Industries, Inc. v. Local 112, United Brotherhood of Carpenters and Joiners,* 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982). An award of attorneys' fees as an element of damages in a contract action would, of course, require the applicant for such an award to have prevailed in the lawsuit by proving breach. However, the source of authority for the award would be the contractual undertaking rather than any judge-made or statutory rule imposing fees in the nature of costs. Moreover, since most contracts derive their legal sanction from state law, the rules with respect to the availability of attorneys' fees as damages for breach, are, generally at least, state law rules. In this unique situation, however, the Randolph-Sheppard Act prescribes the terms and conditions on which the participating states may contract with blind vendors, and thus a federal rule of contract damages is appropriate, if not mandated. *See id.; F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber,* 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

■ If this were an arbitration award reviewed under the standard applicable to Federal Arbitration Act cases, we would not hesitate to defer to the arbitrators' determination that a fee award is an appropriate contract damages remedy, since it would be within the authority of the arbitrators to decide both legal and factual questions. Because under 20 U.S.C. § 107d–2(a) and 5 U.S.C. § 706(2)(A) our decision on legal questions is plenary, on this question we owe the arbitrators no deference.

■ The question whether, as a matter of federal law, attorneys' fees are an appropriate element of damages for breach of contract between a blind vendor and a Randolph-Sheppard state licensing agency is entirely novel. It must be answered by determining what Congress intended—or perhaps might have said had the precise issue been addressed—when it required participating states to contract on the terms it specified. *Summit Valley,* 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511. The overall congressional intent is clear enough, and is characterized by an unusually heightened concern for persons handicapped by blindness who could, with help, become self-sufficient. The evolution of the Randolph-Sheppard Act from 1936 through 1974 shows increasing concern that the contractual remedies available to those vendors be expeditious and completely effective. Although the statute does not deal specifically with pre-arbitration legal expenses, the overall scheme strongly suggests that the states must undertake to make blind vendors whole for breaches of the contractual obligations imposed on them by virtue of participation in the Federal Blind Vendors Program. Unlike the back pay remedy discussed in part III A, the fee question is, in our judgment, a close one. We conclude on balance that the undertaking of the states participating in the Randolph-Sheppard program is to make blind vendors whole for state breaches of contract, and that an award of attorneys' fees as contract damages is, in this unique circumstance, an appropriate means to that end.[14] Delaware has not met its burden of

---

**14.** While our conclusion that attorneys' fees are an appropriate make-whole remedy for breach of a Randolph-Sheppard contract makes it unnecessary for us to decide whether an award would have been appropriate in any event because of Delaware's obduracy in resisting a justified claim. We note that Delaware at all stages opposed Albanese's claim despite its obvious merit. This course of conduct appears to be the kind of obduracy justifying a fee award. See *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). Further, we note that in *Georgia Dep't of Human Resources v. Bell,* 528 F.Supp. 17 (N.D.Ga.1981), relied on by Delaware, the court did not address the fee request in terms of either contract damages or obduracy.

showing that the broad make-whole powers of the arbitration panel in this contractual situation did not include the power to award such fees.

## IV.

### Conclusion

The judgment vacating the arbitration award will be reversed and the case remanded for the entry of an order confirming it in full. 9 U.S.C. § 9 (1980).